No. 53,479

STATE OF KANSAS, *Appellee*, v. JAMES COSTELLO, *Appellant.*

(644 P.2d 447)

Opinion filed May 8, 1982.

*Carl E. Cornwell,* of Horner, Duckers & Cornwell, of Kansas City, argued the cause and was on the brief for the appellant.

*John J. McNally,* chief deputy district attorney, argued the cause, and *Robert T. Stephan,* attorney general, and *Nick A. Tomasic,* district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

FROMME, J.: James Costello was convicted by a jury of first-degree murder (K.S.A. 21-3401) and attempted aggravated robbery (K.S.A. 21-3427 and K.S.A. 21-3301).

On April 3, 1981, the body of Andrew Johnson was found in his house at 1941 North 3rd Street, Kansas City, Kansas. An autopsy revealed that Johnson had been severely beaten and his body evidenced multiple cuts and bruises. A pathologist who performed the autopsy testified at the trial that the cause of death was an obstruction of the bronchial tubes caused by blood.

Detective James Parks of the Kansas City Police Department responded to the notice of discovery of the body. He began an

investigation at the scene of the crime. While outside the residence where the body was found, he was approached by an informer who told him: "Check Costello; he was there last night; he is acting very strangely, along with a party by the name of Shug." After determining the identity of Shug and talking with her mother, Detective Parks located James Costello. The detective recovered a knife from Costello, and observed what appeared to be blood stains or splatters on Costello's shoes. At that time Costello was placed under arrest.

Subsequently, Mary Ella Bagby, also known as Shug, was arrested. At first she denied any knowledge of the homicide but later gave a statement to the police that James Costello was the party who killed Andrew Johnson. She was charged, along with Costello, with first-degree murder but she was discharged at the preliminary hearing. She testified against Costello at trial. As a result of Miss Bagby's statement, the police were able to recover a pair of pants that Miss Bagby said Costello was wearing at the time of the homicide. Blood on those pants matched the blood type of the victim, Andrew Johnson.

The State presented two additional items of evidence against Costello: Costello's fingerprints on a whiskey bottle found by the body of the victim, and a ring worn by Costello, which ring matched an impression or bruise appearing on the face of the victim. The ring was removed from Costello when he was booked into the county jail, and was introduced into evidence at the trial.

The appellant Costello raises two points of claimed error. First, he claims the court erred in refusing to dismiss the case because of a lack of probable cause for his arrest.

This claim of error is without merit. Probable cause for arrest exists if facts and circumstances within an arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been or is being committed. *State v. Weigel,* 228 Kan. 194, 612 P.2d 636 (1980); *State v. Williams,* 229 Kan. 290, 623 P.2d 1334 (1981); *Draper v. United States,* 358 U.S. 307, 3 L.Ed.2d 327, 79 S.Ct. 329 (1959).

In the present case a detective interviewed a Mr. McGee on the day the body was found and the detective was told that Costello and Bagby were at Johnson's house between 11:00 p.m. on April 2nd, and 2:00 a.m. on April 3rd. The body was found the after-

noon of April 3rd. McGee described Costello and later picked him out of a photo lineup. The detective who made the arrest first visited the scene of the crime, viewed the battered body, noticed numerous cuts on the legs, and a large amount of blood. The detective was approached by an informant in front of the residence where the body was discovered, and was advised to check Costello, because he was at the house the night before and was acting strangely. The detective knew Costello personally and located him. Costello had a knife on him at the time and the detective observed splatters of what appeared to be blood on Costello's shoes and jacket. Under the rule stated in *State v. Weigel,* 228 Kan. 194, and iterated above, there was probable cause for the arrest. See also *State v. Holthaus,* 222 Kan. 361, Syl. ¶ 1, 564 P.2d 542 (1977), and *State v. Stewart,* 225 Kan. 410, 412-13, 591 P.2d 166 (1979).

Now we turn to the second point raised by appellant. At the time of appellant's arrest and incarceration, a search of his person was made and various items of personal property were inventoried and placed in a personal property envelope for safekeeping at the Wyandotte County Jail. A large ring with a distinctive square face was removed from his finger and placed in the envelope. Just before the trial the ring was removed from the personal property envelope by the police, and it was introduced in evidence. Prior to its introduction, a pathologist testified that the body of the victim was examined by him, and the face of the victim bore a bruised impression which appeared to have been made by the impact of a square ring. He testified that the ring taken from appellant's finger could have caused the specific injury to the face of the deceased.

Argument on this point is twofold. First, an objection is made to the introduction of the ring in evidence because it is alleged the ring was procured by the State from the personal property envelope without a search warrant and therefore obtained by an illegal search and seizure. Second, it is argued the prosecution did not divulge an intent to use this ring as evidence until the day of the trial and this resulted in a violation of the provisions of K.S.A. 60-445 relating to surprise. We will discuss these in turn.

It must be conceded that courts are in disagreement as to whether personal items exposed to police view in a search incident to a lawful arrest and then lawfully held by the police for

safekeeping may be subjected to a "second look" while remaining in police custody. At least one appellate court in Illinois has held a "second look" under the circumstances described in the case was a violation of the defendant's right of privacy as to his personal effects under the 4th Amendment. In *Brett v. United States,* 412 F.2d 401 (5th Cir. 1969), it was held that a clothing search was illegal in the absence of a warrant when the search was made in the property room three days after the arrest of the accused.

However, in Michigan a "second view" was held proper when possession was originally obtained by the police under unobjectionable circumstances. In *People v. Rivard,* 59 Mich. App. 530, 230 N.W.2d 6 (1975), it is held any expectation of privacy with respect to such items has dissipated substantially so that no reasonable expectation of privacy is breached by taking a "second look."

In *United States v. Jenkins,* 496 F.2d 57 (2nd Cir. 1974), a defendant was arrested on a concealed weapons charge. His clothing and wallet containing several bills were taken from him, inventoried, and given to a jailer for safekeeping. A week later a federal agent was granted permission by the property custodian to view the money. The agent discovered that the serial numbers on eleven five-dollar bills were the same as serial numbers on "bait money" taken in a recent robbery. The search or "second look" was upheld. The *Jenkins* court, citing *United States v. Edwards,* 415 U.S. 800, 39 L.Ed.2d 771, 94 S.Ct. 1234 (1974), rejected the argument that a "second look" violated constitutional rights and said:

"Wilcox contends that the 'second look' at and warrantless seizure of the money by the agent violated his constitutional rights. However, the content must be rejected, in view of the Supreme Court's recent decision in United States v. Edwards, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), upholding a warrantless search and seizure of the defendant's clothing while he was lodged in a local jail after arrest and stating that such a seizure is permissible 'where the clothing or effects are immediately seized upon arrival at the jail, held under the defendant's name in the "property room" of the jail and at a later time searched and taken for use at the subsequent criminal trial.' 415 U.S. at 807, 94 S.Ct. at 1239. This argument ignores the fact that once the money had been lawfully taken by the police for safekeeping Wilcox no longer could reasonably expect any right of privacy with respect to the serial numbers, see Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). The contention has been squarely rejected by the Ninth Circuit in Westover v. United

States, 394 F.2d 164 (9th Cir. 1968), cited with approval by the Supreme Court in United States v. Edwards, *supra,* at 415 U.S. 804, 807, 94 S.Ct. 1234, where the court said:

" '[I]t appears that taking a prisoner's money from him and putting it in the property room was regular jail procedure for all prisoners. . . . In taking the money, no one would suggest that at that instant a search warrant would be required to list the numbers of the bills. Thus, a search warrant to again look at the money already in police custody does not make sense.' 394 F.2d at 165." 496 F.2d at 73-74.

In *United States v. Edwards,* 415 U.S. at 807, the United States Supreme Court states:

"[O]nce the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other. This is true where the clothing or effects are immediately seized upon arrival at the jail, held under the defendant's name in the 'property room' of the jail, and at a later time searched and taken for use at the subsequent criminal trial."

In *Edwards* the defendant was arrested and detained in jail. More than 10 hours after incarceration his clothing was taken from him and examined for paint chips similar to those found at the scene of the crime. On finding paint chips, the clothes and paint chips were held for evidence. The court treated the search as a search-incident-to-custodial-arrest. As such the search was proper as an exception to the warrant requirement of the 4th Amendment.

In our case approximately two and one-half months passed from the time of the inventory of personal effects to the "second look" or search of defendant's personal effects in hope of finding the ring. In the present case we believe it would be essentially the equivalent of a plain view case and consequently not such a significant intrusion as to require the prior authorization of a judicial officer. The ring had previously been viewed by the police when the personal effects of the defendant were inventoried. Once the object has been exposed to police view under unobjectionable circumstances and lawfully taken for safekeeping, a "second look" would not appear to unduly intrude upon the arrestee's expectation of privacy.

Various cases have permitted a "second look" at items previously viewed by the police and inventoried for safekeeping. See

*Evalt v. United States,* 382 F.2d 424 (9th Cir. 1967), where a packsack held in the property room was examined after some delay; *United States v. Oaxaca,* 569 F.2d 518 (9th Cir.), *cert. denied* 439 U.S. 926 (1978), where there was a six weeks' delay before a search of defendant's shoes; *Baskerville v. United States,* 227 F.2d 454 (10th Cir. 1955), where there was a 14-day delay in obtaining a forged I.D. card from personal effects held in the property room; and *United States v. James,* 432 F.2d 303 (5th Cir. 1970), *cert. denied* 403 U.S. 906 (1971), where there was a six-hour delay of the search of defendant's wallet held in sheriff's custody.

On the basis of the holdings in the foregoing cases, we hold when an accused has been lawfully arrested and is being held in custody, the personal effects in his possession at the time and place of his arrest may lawfully be searched, inventoried, and placed in safekeeping by the police without a search warrant when the search and seizure is incidental to the arrest. Thereafter, although a substantial period of time may have elapsed since the administrative processing, a "second look" at the inventoried personal effects may be obtained without a search warrant, and any property which is relevant for use as evidence in the accused's trial may be removed from the place of safekeeping.

The final question is whether the trial court abused its discretion in allowing testimony regarding the ring and in admitting the ring itself into evidence because the appellant was unaware of this evidence until the day of the trial.

Under K.S.A. 60-445 the trial court has discretion to exclude relevant evidence based on surprise and prejudice to the defendant. K.S.A. 60-445 provides:

"Except as in this article otherwise provided, the judge may in his or her discretion exclude evidence if he or she finds that its probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered."

This point is without merit. Appellant's counsel first heard about the ring evidence during the prosecutor's opening statements on the first day of trial. On the second day, before the court proceedings resumed, appellant's counsel objected to this evidence on the basis of surprise. He argued he was not a doctor and had no opportunity to take the evidence to a pathologist at the

K.U. Medical Center to refute what Dr. Roth was going to say. The trial court was sympathetic.

"THE COURT: Is there any reason why you could not call, after we hear from the doctor, why you could not call your pathologist at KU? I would have no objection to making an appointment for him as an expert if you could have someone deliver the ring and the photographs to him this afternoon and have him look at them and, you know, if you need a recess early this afternoon to go over and interview him, I'm more than willing to allow you to do that."

Counsel did not take advantage of the court's offer. The trial court did not abuse its discretion under K.S.A. 60-445 in admitting this evidence. *State v. Egbert,* 227 Kan. 266, 269-70, 606 P.2d 1022, *cert. denied* 449 U.S. 965 (1980).

In *State v. Nicholson,* 225 Kan. 418, 419-20, 590 P.2d 1069 (1979), it is said:

"The admissibility of physical evidence lies within the sound discretion of the trial court and is to be determined on the basis of its relevance in connection with the accused and the crime charged. [Citations omitted.] Moreover, relevant evidence is defined under K.S.A. 60-401(*b*) as evidence having any tendency in reason to prove any material fact. The determination of relevancy.is a matter of logic and experience, not a matter of law. [Citations omitted.] Furthermore, when a physical object is offered into evidence and a question arises as to its connection with either the defendant or the crime charged, unless it is clearly irrelevant, the object should be admitted for such weight and effect as the jury sees fit to give it. [Citation omitted.]"

Judgment affirmed.